THE SPENCE LAW FIRM, LLC
R. Daniel Fleck (*pro hac vice pending*)
G. Bryan Ulmer, III (*pro hac vice pending*)
Michael F. Lutz (Idaho Bar # 9218)
15 S. Jackson Street, P.O. Box 548
Jackson, WY 83001
(307) 733-7290 / (307) 733-5248 (fax)

PETERSON LAW OFFICES
Charles F. Peterson (Idaho Bar # 3346)
913 W. River Street # 420
Boise, ID 83702
(208) 342-4633 / (208) 336-2059 (fax)

*Attorneys for the Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONNA J. YANTIS; SARAH A. YANTIS; LAURETTA D. YANTIS; and ROWDY L. PARADIS<br><br>    *Plaintiffs*,<br><br>    vs.<br><br>ADAMS COUNTY, IDAHO; the ADAMS COUNTY SHERIFF'S OFFICE; RYAN ZOLLMAN, individually and in his official capacity as the Adams County Sheriff; CODY ROLAND, individually and in his official capacity as an Adams County Deputy Sheriff; BRIAN WOOD, individually and in his official capacity as an Adams County Deputy Sheriff; and JOHN/JANE DOES 1-10, individually and in their official capacities,<br><br>    *Defendants*. | Case No.: 1:17-cv-430-DCN<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## I.    PARTIES

### Plaintiffs

1.    Plaintiff Donna J. Yantis is an Idaho citizen residing in Adams County, Idaho.

COMPLAINT AND DEMAND FOR JURY TRIAL — 1

2.     Donna was married to the late Jack Fred Yantis from 1973 until Adams County Sheriff's Deputies Cody Roland and Brian Wood gunned him down on November 1, 2015.

3.     Plaintiff Sarah A. Yantis is an Idaho citizen residing in Adams County, Idaho.

4.     Sarah is Jack and Donna's younger daughter.

5.     Plaintiff Lauretta D. Yantis is a Montana citizen residing in Montana.

6.     Lauretta is Jack and Donna's older daughter.

7.     Plaintiff Rowdy L. Paradis is an Idaho citizen residing in Adams County, Idaho.

8.     Rowdy is Jack and Donna's nephew.

9.     Collectively, Plaintiffs will be referred to as "the Yantis Family."

### Defendants

10.     Defendant Adams County, Idaho is a corporate body pursuant to I.C. § 31-601 and other applicable law.

11.     Defendant Ryan Zollman is an Idaho citizen.

12.     In his official capacity as Adams County Sheriff, Sheriff Zollman was an officer of Adams County pursuant to I.C. § 31-2001(1) and other applicable law.

13.     Sheriff Zollman's culpable acts and omissions were undertaken under color of state law.

14.     Sheriff Zollman operated the Adams County Sheriff's Office as an instrumentality of Adams County.

15.     Sheriff Zollman, as a statutory officer of Adams County, had final policymaking authority for Adams County and the Adams County Sheriff's Office, and acted as a final policymaker with regard to all of his culpable decisions, including hiring, retaining, training, supervising, and controlling deputy sheriffs.

16.     Defendant Cody Roland is an Idaho citizen.

17.   In his official capacity, Deputy Roland was a deputy acting on behalf of Adams County, the Adams County Sheriff's Office, and Sheriff Zollman.

18.   Deputy Roland's culpable acts and omissions were undertaken under color of state law.

19.   Defendant Brian Wood is an Idaho citizen.

20.   In his official capacity, Deputy Wood was a deputy acting on behalf of Adams County, the Adams County Sheriff's Office, and Sheriff Zollman.

21.   Deputy Wood's culpable acts and omissions were undertaken under color of state law.

22.   Collectively, Deputies Roland and Wood will be referred to as "the Deputies."

23.   John/Jane Does 1-10 are persons acting on behalf of Adams County, the Adams County Sheriff's Office, Sheriff Zollman, Deputy Roland, and/or Deputy Wood; and/or whose acts or omissions were actual, direct, and proximate causes of the shooting of Jack Yantis, the detention of Donna Yantis, and/or the detention of Rowdy Paradis.  The true identities, acts, and/or omissions of John/Jane Does 1-10 are presently unknown.  The Yantis Family will amend this Complaint to state the John/Jane Does' true names and involvement if and when discovered.

## II.   JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

24.   Plaintiffs incorporate by reference all allegations contained in this Complaint.

25.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 and other applicable law because this action arises under the Constitution and laws of the United States to redress the Defendants' deprivation of the Yantis Family's civil rights, and because those claims arising under Idaho law form part of the same case or controversy under Article III of the United States Constitution.

26.    This Court has specific personal jurisdiction over Defendants because they committed acts and omissions giving rise to the Yantis Family's damages in Idaho.

27.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) and other applicable law because Defendants reside in Idaho and because a substantial part of the events or omissions giving rise to the case occurred in Idaho.

28.    On April 26, 2016, the Yantis Family timely presented a Notice of Idaho Tort Claims to Adams County Clerk Sherry Ward.

29.    This Notice was sufficient in all respects to preserve Plaintiffs' rights to assert claims against Defendants under Idaho state law.

30.    The Notice is attached as Exhibit A.

31.    Adams County denied the claim.

32.    Plaintiffs have satisfied the requirements of I.C. §6-610 by posting a bond with two sufficient sureties prior to the filing of the Complaint and in accordance with the Orders of this Court.

### III.    FACTS

33.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

**Motor Vehicle-Livestock Collisions in Adams County**

34.    Adams County has long stretches of public highway on open-range land.

35.    In particular, Highway 95 — the main north-south artery through the state — runs through Adams County.

36.    Motor vehicle-livestock collisions are common in Adams County.

37. If livestock are mortally injured in a motor vehicle collision, the routine and longstanding practice is for the Adams County Sheriff's Office, through its dispatcher and deputies, to notify the animal's owner and request that he or she put down the animal with a firearm.

38. Thus, it is highly foreseeable that deputies will routinely encounter citizens using loaded firearms.

39. This type of situation requires that any deputies present control the scene, communicate with the animal's owner before he or she prepares to shoot the animal, and avoid startling or physically interfering with the owner as he or she prepares to fire.

40. This type of situation also requires that deputies put down livestock themselves if they perceive that an animal is a threat to bystanders.

**Deputy Roland's Unfitness as a Law Enforcement Officer**

41. In 2007, while working for the Valley County Sheriff's Office, Deputy Roland was counseled for his attitude during a traffic stop.

42. In 2008, while working for the Valley County Sheriff's Office, Deputy Roland received a letter of reprimand and one year of probation for conduct unbecoming of an officer.

43. In 2010, while working for the Valley County Sheriff's Office, Deputy Roland had a sexual relationship with a woman who was known to be providing confidential information to criminals.

44. In 2011, the Valley County Sheriff determined that Deputy Roland had mischaracterized his history of military service on employment application materials.

45. Adams County, the Adams County Sheriff's Office, and Sheriff Zollman hired deputy Roland in August of 2015.

46. The decision to hire Deputy Roland was the act of a final policymaker.

47.   At that time and thereafter Adams County, the Adams County Sheriff's Office, and Sheriff Zollman knew or should have known that Deputy Roland was unfit for employment as a law enforcement officer.

**Deputy Wood's Unfitness as a Law Enforcement Officer**

48.   Deputy Wood has long had an unhealthy obsession with firearms and explosives.

49.   Deputy Wood has also long been obsessed with the idea of killing, including how to train himself to kill automatically and without remorse.

50.   Wood claimed to manufacture high explosives.

51.   Wood sold guns and ammunition.

52.   Wood bragged at every possible occasion that he had extensive firearms training and had trained Navy SEALs and SWAT team members.

53.   In July of 2006, before becoming a law enforcement officer, Wood was questioned by Boise Police Department officers for walking on the Boise State University campus with an exposed handgun.

54.   Wood was carrying two guns during this incident.

55.   Following the incident, Wood wrote an editorial in the BSU student newspaper, *The Arbiter*, under the headline "Callin' out the cops."

56.   Woods condescendingly bragged that he had more knowledge of firearms than the Boise Police Department officers and challenged them to a shooting match.

57.   By late 2012, Wood was a self-described "survivalist" or "prepper" who believed that the collapse of society was imminent, and that it would soon be necessary to kill looters.

58.   Wood believed that humans have a natural resistance to killing each other, and that to be a "good prepper" one must train oneself to "actually pull the trigger on another human."

59.  Wood also publicly stated: "I have a natural aversion to hard work, but I do it because it is necessary. Animals have a natural aversion to killing their own kind, but will do it in the right circumstances."

60.  Deputy Wood first became a law enforcement officer when hired by the McCall Police Department on February 1, 2010.

61.  On July 6, 2011 Deputy Wood pulled over an elderly man for going two miles per hour over the speed limit.

62.  The man was recovering from a major surgery.

63.  During the traffic stop, Wood used excessive force when apprehending the man and injured him.

64.  In late 2011, Deputy Wood illegally poached an elk.

65.  Deputy Wood wasted most of the elk's meat, taking only a few choice pieces.

66.  Deputy Wood's poaching resulted in an investigation by the Idaho State Police.

67.  During that investigation, Deputy Wood falsely told the Idaho State Police that he wasted the elk's meat because he had to work the following day.

68.  In fact, Deputy Wood was off duty for three days following the poaching.

69.  Deputy Wood was terminated from the McCall Police Department on November 30, 2011 — less than two years after he was hired.

70.  Deputy Wood did not hold any other law enforcement job until June 27, 2013 when Adams County, the Adams County Sheriff's Office, and Sheriff Zollman hired Deputy Wood as a marine officer.

71.  On September 20, 2013, Adams County, the Adams County Sheriff's Office, and Sheriff Zollman transferred Deputy Wood to patrol duty.

72.   The decision to hire Deputy Wood was the act of a final policymaker.

73.   At that time and thereafter Adams County, the Adams County Sheriff's Office, and Sheriff Zollman knew or should have known that Deputy Wood was unfit for employment as a law enforcement officer.

### The Yantis Family

74.   Jack Yantis was born in 1953.

75.   Jack and Donna met while attending elementary school together in Council, Idaho.

76.   Jack and Donna were married in 1973.

77.   Jack worked hard as a logger until he saved enough to buy a ranch from Jack's uncle.

78.   The ranch has been in Jack's family for over a century.

79.   Jack and Donna lived on the ranch since the late 1980's.

80.   On November 1, 2015, both Jack and Donna were sixty-two years old.

81.   Jack was a relatively small man — only 5'6" tall.

82.   In the 1980s Jack's left great toe was partially severed, which made him less stable on his feet.

83.   In 2009 a horse threw Jack and broke his pelvis.

84.   His past injuries caused him to walk slowly and deliberately and have more difficulty with his balance.

### The Deputies Arrive

85.   On or about the evening of November 1, 2015, a bull strayed from the Yantis Ranch and was hit by a car traveling southbound on Highway 95 where it bisects the ranch.

86.    At some point, bystanders shooed the bull northeast up the highway, well away from the accident victims and first responders.

87.    The bull was very badly injured and had difficulty walking.

88.    The bull did not charge anyone.

89.    The bull ended up by the driveway to the Yantis Ranch, on the east side of the road, facing roughly southeast.

90.    Deputy Roland arrived on the scene at about 7:00 p.m.

91.    Deputy Roland was armed with a semi-automatic pistol.

92.    Deputy Roland was also armed with Oleoresin Capsicum ("OC") spray.

93.    Deputy Roland was 6'3" tall and was 38 years old — 9 inches taller and 24 years younger than Jack.

94.    Deputy Wood arrived on the scene at about 7:12 p.m.

95.    Deputy Wood was armed with a semi-automatic rifle and a pistol.

96.    Deputy Wood's rifle — his personal AR-15 — had numerous custom upgrades including a Noveske barrel, flash suppressor, and holographic sight with a magnifier.

97.    Deputy Wood had additional firearms in his patrol vehicle.

98.    However, Deputy Wood had no functional less-than-lethal weapon.

99.    Deputy Wood's Taser had been broken for months.

100.    Deputy Wood was 6'2" tall and was 31 years old — 8 inches taller and 31 years younger than Jack.

101.    Deputy Roland had never met Jack before.

102.    Deputy Roland knew nothing about Jack — not even by reputation.

103.    Deputy Wood had never met Jack before.

104. Deputy Wood knew nothing about Jack — not even by reputation.

105. The Deputies stood on the west side of the highway across from the bull.

**Adams County Asks Jack Yantis to Put Down the Bull**

106. Jack, Donna, Rowdy, and a family friend, veterinarian Joe Rumsey, were having dinner at the ranch house.

107. At approximately 7:08 p.m. a dispatcher acting on behalf of Adams County, the Adams County Sheriff's Office, and Sheriff Zollman called the Yantis Ranch.

108. Donna answered.

109. The dispatcher asked the Yantis Family to put down the bull, stating: "If you would like to respond there we would appreciate it."

110. Donna was polite and calm throughout the call. She even thanked the dispatcher at the end of the call.

111. By this time it was dark.

112. As Jack, Donna, Rowdy, and Joe Rumsey prepared to take care of the bull, Deputy Wood wantonly fired at least six non-lethal shots into the bull's body.

113. Deputy Wood fired these shots from the west side of the highway, toward the Yantis Ranch driveway.

114. Deputy Wood's shooting toward the Yantis Ranch driveway posed an unnecessary danger to Jack, Donna, Rowdy, and Joe Rumsey, who predictably would be coming down the driveway, in the dark, to deal with the bull.

115. If he believed that the bull was a threat to human safety, Deputy Wood should have put down the bull with a single deadly kill shot to the head, rather than multiple body shots.

116. If he believed that the bull was a threat to human safety, Deputy Wood should have advised Jack — either directly, thorough the dispatcher, or both — not to approach the bull.

**Jack and His Family Comply with Defendants' Request**

117. Upon receiving the dispatch call, everyone at the Yantis Ranch acted to assist.

118. Rowdy drove a skid-steer to the bull.

119. He brought a length of chain in the skid-steer bucket to remove the bull after it was put down.

120. He parked the skid-steer in the southbound lane, pointed northeast toward the bull.

121. He kept the headlights on and pointed at the bull to make it easier for Jack to see and put down the bull.

122. Jack drove to the bull on a four-wheeler.

123. At that time he was unarmed.

124. He left the headlights on and parked the four-wheeler pointed at the bull to make it easier to see and put down the bull.

125. Donna walked from the ranch house with a bolt-action rifle.

126. The Deputies saw Donna but said nothing to her.

127. Donna openly handed the rifle to Jack.

128. The Deputies saw Jack but said nothing to him.

129. The Deputies saw Jack load his rifle, but still said nothing to him.

130. Jack approached the bull with the rifle.

131. The Deputies saw Jack approaching the bull with the rifle, but still said nothing to him.

132.   According to the Deputies, Jack allegedly said something to the effect of "put that piece of s--- away" or "get that piece of s--- away from my animal" in a "gruff" voice, but not in a yell.

133.   The Deputies have never claimed that Jack said anything else to them.

134.   The Deputies do not claim that they ever said anything to Jack to clarify his alleged comment.

135.   Other than the single sentence that Jack allegedly uttered, the Deputies had no other information whatsoever about his disposition or emotional state.

136.   The Deputies did not ask Jack to shoot from any particular location or in any particular direction.

137.   The Deputies did not ask Jack to wait to shoot the bull until they had cleared the scene.

138.   Instead, the Deputies claim that they shined their flashlights on the bull, thereby inviting Jack to continue.

139.   At this time the bull was on the shoulder of the northbound lane, slightly north of the driveway to the Yantis Ranch.

140.   Donna was standing south of Jack, near the four-wheeler.

141.   Rowdy was standing to the southwest of Jack, near the skid-steer.

142.   Jack moved around the bull, lining up a safe and effective shot to put it down.

143.   Jack pointed his rifle directly at the bull's head.

144.   The barrel of Jack's rifle was two feet or less from the bull's head.

145.   Jack's rifle was angled down, toward the ground, and roughly to the east.

146.   There were no people in the direction Jack's rifle was pointed.

147.   The crash scene was approximately fifty to one hundred yards to the southwest down Highway 95.

148.   Jack was focused intently on the bull.  He was about to pull the trigger.

149.   Under the circumstances, no reasonable officer on the scene would have feared for his safety.

150.   It was obvious that Jack was not committing a crime and posed no threat to anyone.

**Deputies Roland and Wood Assault Jack and then Kill Him**

151.   At approximately 7:25 p.m. — without any warning, provocation, or justifiable excuse — one Deputy suddenly stepped up behind Jack, grabbed him, and jerked him around and backwards.

152.   Jack's rifle never pointed at either Deputy.

153.   The deputies did not ask Jack to put the rifle down.

154.   They did not give him any other requests, commands, or warnings.

155.   They did not fire any warning shots.

156.   They did not employ any less-than-lethal weapons or techniques.

157.   The Deputies did not say anything to Jack.

158.   The Deputies drew their weapons and shot at Jack before ever perceiving a threat, much less a deadly threat.

159.   Jack's rifle had a light trigger pull — only about two-and-a-half to two-and-three-quarters pounds.

160.   Jack's rifle inadvertently discharged either when the Deputy manhandled him or when the Deputies started shooting him.

161.   Jack never attempted to re-load — the casing of the single bullet fired from his rifle remained in the chamber.

162.   Jack never even regained his balance.

163.   The Deputies shot with intent to kill Jack, rather than to warn him or injure him.

164.   Deputy Wood shot as fast as he could.

165.   The Deputies shot at least fourteen times.  Deputy Wood fired at least ten times.  Deputy Roland fired at least four times.

166.   Twelve of their bullets hit Jack.

167.   Because the deputies' weapons were semi-automatic, they intentionally pulled a trigger for each bullet fired.

168.   Jack fell dead in the middle of the southbound lane.

**Deputies Roland and Wood Assault Donna and Rowdy**

169.   Both Donna and Rowdy saw the deputies gun Jack down.

170.   In violation of Adams County Sheriff's Office Policy 7.509(3), neither Deputy determined Jack's physical condition after shooting him or attempted to render first aid.

171.   Immediately after the Deputies shot Jack, Donna and Rowdy tried to get to Jack to help him.

172.   Deputy Roland pointed his gun at Donna and told her to get on the ground.

173.   Donna complied, getting on her hands and knees.

174.   Deputy Roland then pushed Donna all the way to the ground.

175.   Deputy Roland wrenched Donna's arms behind her back to handcuff her wrists together.

176.   Donna told Deputy Roland that he was hurting her.

177.   Deputy Roland held a gun to Donna's head.

178.   Donna was terrified that Deputy Roland was going to shoot her, just as he had shot her husband moments earlier.

179.   Deputy Roland searched Donna.

180.   Donna did not have any weapons.

181.   She told Deputy Roland that she did not have any weapons.

182.   Nonetheless, Deputy Roland kept her detained in handcuffs.

183.   Even after the Deputies removed the handcuffs from Donna, they confined her to the area behind one of the Sheriff's Office pickup trucks on the scene.

184.   This extended detention was an arrest.

185.   There was neither probable cause to arrest nor reasonable suspicion to detain Donna.

186.   Deputy Wood pointed his AR-15 at Rowdy.

187.   Deputy Wood ordered Rowdy to get down on the ground.

188.   Rowdy complied.

189.   Deputy Wood stepped or knelt on Rowdy's back and violently wrenched his arms upward.

190.   Rowdy told Deputy Wood that he had a shoulder injury, and asked Deputy Wood not to pull his arms so hard.

191.   Deputy Wood ignored Rowdy's pleas, handcuffed him, and pulled violently on his arms.

192.   Deputy Wood then placed the barrel of his AR-15 to the back of Rowdy's head.

193.   Rowdy thought that Deputy Wood was about to kill him.

194.   Even after he was allowed to stand up, the Deputies kept Rowdy confined, in handcuffs, to the area behind one of the Sheriff's Office pickup trucks on the scene.

195.   When Sheriff Zollman arrived on the scene, Rowdy asked him to remove the handcuffs.

196.    Sheriff Zollman did not do so.

197.    This extended detention was an arrest.

198.    There was neither probable cause to arrest nor reasonable suspicion to detain Rowdy.

**Deputies Roland and Wood Fabricate a Justification for Killing Jack**

199.    In violation of Adams County Sheriff's Office Policy 7.509(6), Deputies Roland and Wood discussed the incident extensively with each other.

200.    Deputy Roland wrote a statement in Deputy Wood's presence.

201.    Deputies Roland and Wood discussed the incident together with Sheriff Zollman.

202.    Sheriff Zollman was aware that Deputies Roland and Wood were together for over an hour, but made no effort to separate them before they gave statements.

203.    After the shooting the Deputies falsely claimed that Jack had shot Deputy Roland.

204.    In reality, Deputy Roland was totally unharmed.

205.    Adams County, the Adams County Sheriff's Office, and Sheriff Zollman knew this conclusively, having physically inspected Deputy Roland's person and clothing.

206.    Nonetheless, Adams County, the Adams County Sheriff's Office, and Sheriff Zollman publicly stated that Deputy Roland had been injured in order to provide some cover for the Deputies.

207.    Deputy Roland also falsely claimed that Jack has pushed Deputy Wood — despite the fact that this did not happen and even Deputy Wood never claimed it happened.

208.    Bizarrely, Deputy Roland claimed he was already drawing his handgun with intent to kill Jack based on the supposed push alone — a deadly response to a fictional, non-deadly threat.

**The Aftermath: Injuries and Damages the Defendants Caused the Yantis Family**

209. Sarah, a paramedic, arrived on the scene and saw her father lying dead or dying in the road.

210. She attempted to give him medical aid before realizing that it was too late.

211. Sarah then realized that Donna was having a heart attack.

212. Donna's heart attack was brought on by seeing the Deputies kill her husband and the stress of one of the killers manhandling her and holding her at gunpoint.

213. Sarah gave Donna medical care and accompanied her by ambulance and life flight to Boise, worrying all the while that her mother was about to die in front of her.

214. Donna spent over two weeks in the hospital recovering from the heart attack.

215. Donna and Rowdy suffered damages as a result of assault, battery, and false imprisonment by the Deputies.  These damages include, but are not limited to, medical expenses incurred as a result of the Deputies' use of excessive force when unlawfully arresting Donna and Rowdy.

216. Donna, Sarah, and Lauretta are Jack's heirs and entitled to sue for his wrongful death under Idaho law.

217. Their damages include, but are not limited to, funeral costs; loss of services, comfort, and society; and loss of financial support.

218. Donna suffered a loss of her conjugal relationship with Jack.

219. Donna, Sarah, and Rowdy suffered damages as a result of the Deputies' negligent and/or intentional infliction of emotional distress.  Donna, Sarah, and Rowdy have experienced physical manifestations of their emotional injuries.

220. Sarah has suffered a loss of childcare provided by Jack and Donna, and lost income as a result of the loss of childcare.

## IV.   CLAIMS

221. Plaintiffs incorporate by reference all allegations contained in this Complaint.

### FOURTH AMENDMENT CLAIMS

222. The United States Constitution's Fourth Amendment, incorporated by the Fourteenth Amendment, guarantees that The People will be free from unreasonable seizures.

223. This Fourth Amendment prohibits law enforcement officers from seizing innocent citizens without either probable cause to arrest or reasonable suspicion to detain.

224. The Fourth Amendment further prohibits law enforcement officers from using excessive force when seizing citizens, even if there is probable cause or reasonable suspicion.

225. Donna, Sarah, and Lauretta are entitled to bring an action based on the violation of Jack's constitutional rights pursuant to 42 U.S.C. § 1983 and other applicable law.

**Count One: Violation of Jack's Fourth Amendment Rights**
**Brought by Donna, Sarah, and Lauretta**
**Against**
**Deputies Roland and Wood**

226. The Deputy's initial physical assault of Jack was a seizure that was intentional, unreasonable, and contrary to clearly established law.

227. The Deputy who initially assaulted Jack had neither probable cause to arrest nor reasonable suspicion to detain Jack.

228. Even assuming for the sake of argument that the Deputy had probable cause or reasonable suspicion, the Deputy used excessive force to seize Jack.

229.   The Deputies' subsequent use of deadly force to kill Jack was intentional, unreasonable, and contrary to clearly established law.

230.   The Deputies had neither probable cause to arrest nor reasonable suspicion to detain Jack.

231.   Even assuming for the sake of argument that they had probable cause or reasonable suspicion, the Deputies used excessive deadly force to seize Jack.

232.   The Deputies' conduct constituted one continuous, unbroken causal chain that led directly and proximately to the Deputies killing Jack.

233.   In the alternative, both the initial physical assault and subsequent shooting, although separate events, led directly and proximately to the Deputies killing Jack.

**Count Two: Violation of Jack's Fourth Amendment Rights**
**Brought by Donna, Sarah, and Lauretta**
**Against**
**Adams County, the Adams County Sheriff's Office, and Sheriff Zollman**

234.   Sheriff Zollman hired, retained, trained, supervised, and controlled Deputies Roland and Wood.

235.   Sheriff Zollman set in motion a series of acts, and knowingly refused to terminate a series of acts, that he knew or should have known would lead to the Deputies violating an innocent citizen's Fourth Amendment rights.

236.   Deputies Roland and Wood were improperly trained.  Specifically, the Deputies had no training, or improper training, in the use of deadly force and how to manage a scene in which a citizen uses a firearm to put down an animal.

237.   A known or obvious consequence of this lack of training or improper training was that the Deputies would violate an innocent citizen's Fourth Amendment rights.

238.   Sheriff Zollman was deliberately indifferent to the Deputies' lack of training or improper training.

239.   This lack of training or improper training was an actual, direct, and proximate cause of the Deputies assaulting, shooting, and killing Jack.

**Count Three: Violation of Donna and Rowdy's Fourth Amendment Rights**
**Brought by Donna and Rowdy**
**Against**
**Deputies Roland and Wood**

240.   Deputy Roland's seizure of Donna was intentional, unreasonable, and contrary to clearly established law.

241.   Deputy Roland had neither probable cause to arrest nor reasonable suspicion to detain Donna.

242.   Even assuming for the sake of argument that Deputy Roland had probable cause or reasonable suspicion, Deputy Roland used excessive force to seize Donna.

243.   Deputy Wood's seizure of Rowdy was intentional, unreasonable, and contrary to clearly established law.

244.   Deputy Wood had neither probable cause to arrest nor reasonable suspicion to detain Rowdy.

245.   Even assuming for the sake of argument that Deputy Wood had probable cause or reasonable suspicion, Deputy Wood used excessive force to seize Rowdy.

**Count Four: Violation of Donna and Rowdy's Fourth Amendment Rights**
**Brought by Donna and Rowdy**
**Against**
**Adams County, the Adams County Sheriff's Office, and Sheriff Zollman**

246.   Sheriff Zollman hired, retained, trained, supervised, and controlled Deputies Roland and Wood.

247. Sheriff Zollman set in motion a series of acts, and knowingly refused to terminate a series of acts, that he knew or should have known would lead to the Deputies violating innocent citizens' Fourth Amendment rights.

248. Specifically, but without limitation, Sheriff Zollman failed to have Donna and Rowdy released after he knew or should have known they were being improperly held.

249. Deputies Roland and Wood were improperly trained.  Specifically, the Deputies had no training, or improper training, in the Fourth Amendment's limitations on seizing innocent citizens.

250. A known or obvious consequence of this lack of training was that the Deputies would violate innocent citizens' Fourth Amendment rights.

251. Sheriff Zollman was deliberately indifferent to the Deputies' lack of training or improper training.

252. This lack of training or improper training was an actual, direct, and proximate cause of the Deputies' unreasonable seizures of Donna and Rowdy.

253. Following the shooting Sheriff Zollman made a deliberate choice to endorse the seizures and their basis.

254. As such, Sheriff Zollman ratified Deputies Roland and Wood's violation of Donna and Rowdy's Fourth Amendment Rights.

255. Sheriff Zollman had final policymaking authority from Adams County and the Adams County Sheriff's Office.

256. All of Sheriff Zollman's acts and omissions were those of a final policymaker for Adams County and the Adams County Sheriff's Office.

**IDAHO STATE-LAW CLAIMS**

**Count Five: Wrongful Death**
**Brought by Donna, Sarah, and Lauretta**
**Against**
**All Defendants**

257.  Adams County and the Adams County Sheriff's Office can act only through their commissioners, officers, deputies, employees, and agents and are vicariously liable for their acts and omissions within the scope of their duties.

258.  Sheriff Zollman acts through his deputies, employees, and agents and is vicariously liable for their acts and omissions within the scope of their duties.

259.  The guns that the Deputies used to kill Jack were regulated and jointly controlled by the Deputies and by Adams County, the Adams County Sheriff's Office, and Sheriff Zollman.

260.  Deputies Roland and Wood failed to exercise reasonable care by acts and omissions including but not limited to:

    a.    Failing to communicate with Jack before the moment he was poised with his finger on the trigger of his rifle, abut to shoot the bull;

    b.    Physically assaulting Jack as he was poised with his finger on the trigger of his rifle, about to shoot the bull;

    c.    Drawing their weapons, placing their fingers on the triggers, and shooting Jack before they perceived any threat, much less a deadly threat;

    d.    Shooting to kill Jack, rather than employing any less-than-deadly weapons or techniques, and

    e.    Failing to otherwise use reasonable care under all of the circumstances.

261.   Adams County, the Adams County Sheriff's Office, and Sheriff Zollman failed to exercise reasonable care by acts and omissions including but not limited to:

    a.   Negligently hiring and retaining Deputies Roland and Wood, although they knew or should have known that Deputies Roland and Wood were unfit for employment as law enforcement officers;

    b.   Failing to train, or improperly training, the Deputies;

    c.   Failing to enact necessary policies and procedures; and

    d.   Failing to properly supervise or control Deputies Roland and Wood on the night of the shooting, and

    e.   Failing to otherwise use reasonable care under all of the circumstances

262.   Defendants' misconduct was negligent, reckless, malicious, and/or undertaken with criminal intent.

263.   Defendants' misconduct actually, directly, and proximately caused Jack's death.

264.   Defendants' misconduct and Jack's resulting death caused the Yantis Family to suffer damages.

**Count Six: Assault and Battery**
**Brought by Donna and Rowdy**
**Against**
**All Defendants**

265.   Deputy Roland caused Donna to actually and reasonably fear that Deputy Roland was about to kill her.

266.   Deputy Roland's forcible arrest of Donna was unlawful, harmful, offensive, and without consent.

267.   Deputy Roland acted with malice or criminal intent.

268. Deputy Wood caused Rowdy to actually and reasonably fear that Deputy Wood was about to kill him.

269. Deputy Wood's forcible arrest of Rowdy was unlawful, harmful, offensive, and without consent.

270. Deputy Wood acted with malice or criminal intent.

271. Deputies Roland and Wood acted in the service of Adams County, the Adams County Sheriff's Office, and Sheriff Zollman.

272. Adams County, the Adams County Sheriff's Office, and Sheriff Zollman expected, or should have expected, that Deputies Roland and Wood would assault and batter innocent citizens.

273. Adams County, the Adams County Sheriff's Office, and Sheriff Zollman are vicariously liable for the Deputies' conduct.

**County Seven: False Imprisonment**
**Brought by Donna and Rowdy**
**Against**
**All Defendants**

274. Deputy Roland intentionally restrained Donna's physical liberty by detaining her for an extended period of time — including while Donna was suffering from a heart attack.

275. This detention was unlawful and without consent.

276. Deputy Wood intentionally restrained Rowdy's physical liberty by detaining him for an extended period of time.

277. This detention was unlawful and without consent.

278. Sheriff Zollman, acting on behalf of Adams County and the Adams County Sheriff's Office, knowingly approved of and ratified their continued detentions.

279. Deputies Roland and Wood acted with malice or criminal intent.

280.   Deputies Roland and Wood acted on behalf of Adams County, the Adams County Sheriff's Office, and Sheriff Zollman.

281.   Sheriff Zollman acted with malice or criminal intent.

282.   Adams County, the Adams County Sheriff's Office, and Sheriff Zollman expected, or should have expected, that Deputies Roland and Wood would improperly detain citizens.

283.   Adams County, the Adams County Sheriff's Office, and Sheriff Zollman are vicariously liable for the Deputies' conduct.

**Count Eight: Negligent Infliction of Emotional Distress**
**Brought by Donna, Sarah, and Rowdy**
**Against**
**All Defendants**

284.   Defendants had a duty to use reasonable care to avoid actions that could foreseeably cause Donna, Sarah, and Rowdy emotional harm.

285.   Defendants breached this duty through acts and omissions described above.

286.   These breaches, actually, directly, and proximately caused Donna, Sarah, and Rowdy emotional injuries.

287.   Donna, Sarah, and Rowdy suffered physical manifestations of these emotional injuries.

**Count Nine: Intentional Infliction of Emotional Distress**
**Brought by Donna, Sarah, and Rowdy**
**Against**
**Deputies Roland and Wood**

288.   Deputies Roland and Wood intentionally or recklessly killed Jack Yantis.

289.   The Deputies failed to provide Jack medical care.

290.   Instead, the Deputies intentionally or recklessly arrested Donna and Rowdy illegally, at gunpoint, and with unnecessary violence, causing them to reasonably fear that they were about to be killed as well.

291.   The Deputies' conduct was extreme and outrageous.

292.   The Deputies' conduct directly and proximately caused Donna, Sarah, and Rowdy to suffer emotional distress.

## V.    PRAYER FOR RELIEF

The Yantis Family respectfully requests that the Court enter judgment for them and against Defendants for:

I.     Economic damages in an amount that justly compensates them and is consistent with the evidence at trial;

II.    Noneconomic damages in an amount that justly compensates them and is consistent with the evidence at trial;

III.   Punitive damages in an amount adequate to punish Defendants for their reckless and callous indifference to the Yantis Family's civil rights and to deter similar misconduct in the future;

IV.    An award of costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable law; and

V.     All other relief that the Court deems just and equitable.

## VI.    JURY DEMAND

Pursuant to F.R.C.P. 38, the Yantis Family respectfully request that this matter be tried to a jury of six, and have included the appropriate fee.

DATED this 27th day of October, 2017.


By: ___ /s/ Charles F. Peterson _____

PETERSON LAW OFFICES
Charles F. Peterson

THE SPENCE LAW FIRM, LLC
R. Daniel Fleck
G. Bryan Ulmer, III
Michael F. Lutz

*Attorneys for the Plaintiffs*